## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF ILLINOIS *ex rel.* THOMAS PROSE, M.D., <br><br> Relator, <br><br> v. <br><br> HEALTH ALLIANCE MEDICAL PLANS, INC., an Illinois stock insurance company, and HEALTH ALLIANCE CONNECT, INC., <br><br> Defendants. | 1:21-cv-6564 <br> Judge Rebecca R. Pallmeyer <br> Magistrate Judge Jeffrey Cole <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMAND** <br><br> **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** <br><br> **DO NOT PLACE ON PACER** <br> **DO NOT PLACE IN PRESS BOX** |



FILED

DEC 0 8 2021

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

ii

**Table of Contents**

I. INTRODUCTION ............................................................................. 1

II. JURISDICTION AND VENUE .................................................... 7

III. PARTIES ........................................................................................ 8

    A. Relator ................................................................................... 8

    B. Defendants ............................................................................ 8

IV. STATUTORY CONTEXT AND GOVERNMENT HEALTH CARE
    PROGRAMS ................................................................................. 9

    A. The False Claims Act ........................................................... 9

    B. Medicare, Parts A, B, and D ............................................. 12

    C. Medicare Part C .................................................................. 13

    D. Medicaid .............................................................................. 14

    E. Dual Eligibles ..................................................................... 16

V. ILLINOIS MANAGED CARE PROGRAMS FOR MEDICAID
    RECIPIENTS AND DUAL ELIGIBLES WERE DESIGNED FOR
    INTEGRATED AND IMPROVED CARE DELIVERY. ............... 17

    A. Integrated Care Program ................................................... 17

    B. Medicare-Medicaid Alignment Initiative ....................... 23

    C. Requirement to Provide Truthful "Encounter Data" ...... 29

    D. Conditions of Payment Required by the ICP and MMAI Contracts ........ 29

VI. SNFIST SERVICES ARE A KEY REQUIRED COMPONENT IN THE ICP
    AND MMAI CONTRACTS. ........................................................ 31

VII. FACTUAL ALLEGATIONS .......................................................... 36

    A. MCO Health Alliance Entered into ICP and MMAI Contracts that
       Include the Obligation to Provide a SNFist Program for Its Nursing
       Facility Enrollees. .............................................................. 36

    B. Dr. Thomas Prose and His Company, General Medicine of Illinois, P.C.,
       Provide Experienced SNFist Services in Illinois. ......................... 40

    C. General Medicine's Short Tenure with Health Alliance Only Highlighted
       Defendants' Failure to Provide the Required SNFist Programs. .............. 42

    D. Defendants Violated the FCA and IFCA by Failing to Provide SNFist
       Services but Collecting Capitation Rates as If They Had. ...................... 49

VIII. CLAIMS FOR RELIEF .................................................................. 58

**COUNT I - FCA: Presentment of False Claims** ................................................ 58

**COUNT II - FCA: Using False Statements Material to False Claims Paid**.... 59

**COUNT III - FCA: Conversion**......................................................................... 60

**COUNT IV - FCA: Obligation to Pay Money to the Government** ................. 61

**COUNT V - Illinois FCA: Presentment of False Claims**................................. 61

**COUNT VI - Illinois FCA: Using False Statements Material to False Claims Paid**.................................................................................................................... 62

**COUNT VII - Illinois FCA: Conversion** ......................................................... 63

**COUNT VIII - Illinois FCA: Obligation to Pay Money to the Government**.. 64

**PRAYER FOR RELIEF** ............................................................................................ 65

1.    Fraudulently taking money from the Government for services not rendered is a quintessential violation of the False Claims Act (FCA), 31 U.S.C. §§ 3729 *et seq*., and the Illinois False Claims Act (IFCA), 740 ILCS 175/1 *et seq*. Here, the violation is particularly egregious because the amounts taken are in the tens of millions of dollars and the fraud deprives vulnerable nursing facility patients of the essential coordinated care proven to improve their health, avoid the need for additional hospitalizations and medical treatments, and potentially return them to the community. The amounts taken also deprived the Government and the taxpayers of the opportunity to both reduce costs and improve the quality of care for those Medicare and Medicaid beneficiaries in nursing facilities.

2.    Relator Thomas Prose, M.D. brings this Complaint on his own behalf and on behalf of the United States and the State of Illinois alleging that Defendants Health Alliance Medical Plans, Inc. (Health Alliance) and Health Alliance Connect, Inc. (Health Alliance Connect), managed care contractors, violated the FCA and IFCA by failing to provide important health care services to nursing home beneficiaries of Medicare and Medicaid and claiming, receiving and retaining payments from the Government as if they had provided those services. Based on personal knowledge, unless otherwise indicated, and relevant documents, Relator alleges the following:

## I.   INTRODUCTION

3.    The primary figures in this case are the two defendants, both managed care contractors (Health Alliance and its affiliate, Health Alliance Connect), and a provider of

what are called SNFist[1] services (General Medicine of Illinois Physicians, P.C (General Medicine)) that Relator Thomas Prose, M.D. founded and has operated for decades.

4.      Based on the "skilled nursing facility" acronym, "SNFists" provide specialized care intended to better coordinate the unique care needs of nursing facility residents and thereby improve their health; reduce incidents of hospitalization and re-admission; and improve transitions from hospitals to the nursing facility and, for those who are able, back into the community.

5.      The context of the fraud are two health care programs offered by the Centers for Medicare and Medicaid Services (CMS) and the State of Illinois Department of Health and Family Services (HFS), both of which were intended to provide better coordinated and higher quality health care for individuals in the state who relied on the Government for their health care. The Integrated Care Program (ICP) was focused on Medicaid-only beneficiaries, and the Medicare-Medicaid Incentive Alignment demonstration (MMAI) serviced dual-eligible Medicare/Medicaid beneficiaries.

6.      Defendants Health Alliance and Health Alliance Connect signed contracts with CMS and HFS agreeing to provide managed health care plans for those beneficiaries in exchange for monthly capitated payments.

7.      The capitated payments were tiered depending on, among other things, whether the beneficiary resided in the community, received home and community support through waivers, or resided in a nursing facility. The capitated payments were substantially

_____
[1] Pronounced "Sniffists."

2

higher for nursing facility beneficiaries.

8.     Integral to the goals of both the ICP and the MMAI, and built into the requirements of both contracts, was provision of a "SNFist program" for nursing facility beneficiaries. Besides the significant goal of improving the overall well-being of nursing home beneficiaries, the SNFist program mandate was also intended to reduce the significant cost of meeting the medical needs of this particular group.

9.     SNFist services are a response to the reality that nursing facility populations had a high rate of avoidable hospital admissions and re-admissions, such that the 2010 Affordable Care Act (ACA) mandated nursing facilities to reduce the high rate of hospitalizations or face across-the-board cuts in their reimbursement rates. Contributing to the problem, Medicare only paid for higher quality "skilled" nursing services for up to 100 days during a calendar year, and only after certain conditions were met.[2] This meant that once a long-term nursing facility patient's qualification for Medicare coverage of skilled nursing services lapsed, the patient only qualified for basic custodial care covered by Medicaid at a much lower, fixed daily rate. The result was a worse quality of care, often including hospitalization for conditions that could have been avoided with more frequent and skilled attention to the nursing facility patient's medical needs.[3]

10.     CMS and HFS addressed this issue through the ICP and MMAI health care

_____

[2] *See generally*, *Smart Care: When a Loved One Is In A Nursing Home*, Ch. 10, Illinois Citizens for Better Care (2006) http://www.illinoiscares.org/book/chapter10. (All internet citations were last accessed on December 6, 2021.)

[3] *See The Impact of an SNFist on Preventable Hospitalizations*, Tom Prose, available at https://www.generalmedicine.com/impact-snfist-preventable-hospitalizations/ (last accessed Nov. 19, 2021).

programs and accompanying legislation that required Medicaid managed care providers to provide statutorily defined "SNFist" services to *all* beneficiaries residing in a nursing facility, while also providing the MCOs with a higher capitated rate to cover the increased cost. The basic concept was that paying a higher reimbursement rate for SNFist services on the front end would ultimately (A) improve the quality of care for nursing facility patients, and (B) create greater savings on the back end from reduced hospital stays covered by Medicare.

11.     Health Alliance signed ICP and MMAI contracts that were effective September 9, 2013, and March 1, 2014, respectfully. In exchange for its agreement to provide a SNFist program for nursing facility enrollees, Health Alliance claimed, received, and accepted the highest capitation rate every month for each of those enrollees.

12.     But Health Alliance did not even subcontract with a single SNFist provider for over a year and a half after the effective date of the ICP contract. It wasn't until April 15, 2015, that Health Alliance engaged General Medicine to provide a SNFist program for its ICP and MMAI enrollees.  But even then, the provision of SNFist services was limited and short-lived.

13.     General Medicine was prepared to provide a SNFist program for all of Health Alliance's nursing facility enrollees from day one, but Health Alliance refused to assign all of those  enrollees to General Medicine. Over the initial several months, Health Alliance also tried to renege on the amounts it had agreed to pay General Medicine per member per month (PMPM) and refused to pay General Medicine the amounts due for the enrollees it did serve.

4

14.     Ultimately, Health Alliance (and then, upon information and belief, its affiliate Health Connect) stopped assigning nursing facility enrollees to General Medicine and terminated General Medicine's contract effective February 9, 2016.

15.     Health Alliance and Health Connect continued to offer a health plan under the ICP until December 31, 2016, and under the MMAI until December 31, 2015.

16.     Health Alliance and Health Connect also continued to receive, accept, and retain the highest capitation rate for their nursing facility enrollees throughout that time period (close to 40 months) even though they were not providing a SNFist program for all of those enrollees as required by the contract.

17.     Based on exemplar capitation rates, the premium built into the nursing facility rate ranged from about $2,800 to $4,600 more than the community rate and between $1,400 and $2,000 more than individuals being serviced on waivers. Based on available numbers for Health Alliance nursing facility enrollees, Relator estimates that Health Alliance and Health Connect collected tens of millions of dollars for those beneficiaries, knowing full well that they were failing to provide all of them with the SNFist services required under the contracts and that these high-cost services, essential to the nursing-facility population, were the very reason why the United States and Illinois paid a significantly higher capitation rate to support them.

18.     This fraudulent conduct violated the FCA and IFCA in multiple ways.

19.     First, Health Alliance and Health Alliance Connect presented false claims and false statements to CMS and HFS that they were delivering SNFist services when, in fact, they were depriving their eligible enrollees of those services.

5

20. Second, Health Alliance and Health Alliance Connect fraudulently induced CMS and HFS to enter into the contracts by stating their agreement to provide SNFist services as required, but engaging in conduct showing no intent to honor that promise.

21. Third, they failed to return to the Government the premium payments they received for providing SNFist services, knowing full well that they had not provided the services for which the payments were made.

22. Finally, and perhaps most flagrantly, Health Alliance and Health Alliance Connect accepted money they received from the Government for the purpose of providing a very specific benefit for a particularly vulnerable population and, instead, converted that money for their own use.

23. Under nearly identical facts, the Seventh Circuit recently reversed a district court dismissal decision, noting among other things that sophisticated players in this market cannot claim ignorance of their obligations under contracts like these; that these types of facts violate the FCA under theories of factual falsity, fraud in the inducement, and implied certification; and that "[t]he size of the price differential alone offers strong support for a finding of materiality." *U.S. ex rel. Prose v. Molina Healthcare of Illinois, Inc.*, 17 F.4th 732, 743 (7th Cir. 2021) (*Molina*).

24. The claims here warrant imposition of treble damages and civil penalties against Defendants Health Alliance and Health Connect, as well as attorneys' fees and costs for their violations of the FCA and IFCA. *See* 31 U.S.C. §§ 3729(a)(1), 3730(d); 740 ILCS 175/3(a), 730 ILCS 175/4(d).

## II.    JURISDICTION AND VENUE

25.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court over actions under 31 U.S.C. § 3729.

26.    This Court has original jurisdiction of the State law claims pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b) because this action is brought under the laws of the State of Illinois for the recovery of its portion of funds improperly paid as a result of the same scheme as alleged under 31 U.S.C. § 3729.

27.    This Court has personal jurisdiction over Defendants, and venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a), because Defendants can be found, reside, transact substantial business, or committed acts proscribed by 31 U.S.C. § 3729 within this District.

28.    Relator is aware of no statutorily relevant "public disclosure," as that term is used in the FCA, 31 U.S.C. § 3730(e)(4)(A) and the IFCA, 740 ILCS 175/4(e)(4)(A), of the allegations forming the core elements of the Counts against Defendants. Even if such a disclosure had occurred, Relator is an "original source" of the allegations in this Complaint as that term is used in the FCA at 31 U.S.C. § 3730(e)(4)(B) and the IFCA at 740 ILCS 175/4(e)(4)(B). Relator's knowledge of the information on which the allegations in this Complaint are based was obtained independent of, and materially adds to, any public disclosure, and Relator voluntarily and in good faith provided this information to the federal and state governments before filing this action.

7

### III.    PARTIES

#### A.  Relator

29.    The United States of America is one of the governmental plaintiffs on whose behalf Relator brings this action under the FCA. The United States acts through its various agencies and departments, including CMS.

30.    The State of Illinois is also a governmental plaintiff on whose behalf Relator brings this action under the IFCA. Illinois acts through its various agencies and departments, including HFS.

31.    Relator Thomas Prose, M.D. is a citizen of the United States and resides in Martin County, Florida. He is President of General Medicine, an Illinois professional corporation that characterizes itself as "The Post-Hospitalist Company." Relator acquired direct personal knowledge of and non-public information about Defendants' fraudulent scheme through General Medicine's work as a subcontractor providing SNFist services for Health Alliance.

#### B.  Defendants

32.    Defendant Health Alliance is a privately held Illinois stock insurance corporation that offers health care coverage in Illinois. Its principal offices are at 3310 Fields South Drive in Champaign, Illinois. Health Alliance further describes itself as a "Health Maintenance Organization formed for the purpose of delivering covered benefits

8

to Illinois residents enrolled in Health Alliance (enrollees[4]) using a network of contracted organizations and providers."

33.　Health Alliance Connect is a not-for-profit managed care organization that offers health care coverage in Illinois. Health Alliance describes Health Alliance Connect as an "affiliate." Incorporated on December 30, 2013, Health Alliance Connect's principal offices are at 3310 Fields South Drive in Champaign, Illinois.

## IV.　STATUTORY CONTEXT AND GOVERNMENT HEALTH CARE PROGRAMS

34.　Defendants violated the FCA and the IFCA by charging Medicare and Medicaid for services they did not provide. This conduct resulted in false statements and claims made to, and payments made by, the federal government and the State of Illinois through Medicare and the Illinois Medicaid program, as well as overpayments that Defendants failed to reimburse and converted to their own use.

### A. The False Claims Act

35.　The FCA makes it unlawful for any person to submit, directly or indirectly, false or fraudulent claims for payment to the Government. *See* 31 U.S.C. §§ 3729 *et seq*. Relator alleges liability primarily under four of the seven liability provisions in the FCA and IFCA. The IFCA essentially mirrors the federal statute. *See* 740 ILCS 175/1 *et seq*.

36.　First, the FCA's "presentment" provision, 31 U.S.C. § 3729(a)(1)(A), imposes liability against a defendant who "knowingly presents, or causes to be presented,

---

[4] Health Alliance and the ICP and MMAI contracts referenced in this Complaint refer to persons enrolled in a particular MCO health plan as an enrollee. Occasionally documents reference an "enrollee" as a "member."

a false or fraudulent claim for payment or approval." Thus, liability under 31 U.S.C. § 3729(a)(1)(A) attaches when a defendant (a) made, or caused to be made, a claim (b) that was false or fraudulent (c) knowing of its fraudulent nature. *See also* 740 ILCS 175/3(a)(1)(A).

37.   Second, the FCA's "false records or statements" provision, 31 U.S.C. § 3729(a)(1)(B), imposes liability against a defendant who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Thus, liability under 31 U.S.C. § 3729(a)(1)(B) attaches when a defendant (a) made, used, or caused to be made or used, a record or statement that was (b) knowingly false and (c) material to a false or fraudulent claim. *See also* 740 ILCS 175/3(a)(1)(B).

38.   Third, the FCA's "conversion" provision, 31 U.S.C. § 3729(a)(1)(D), imposes liability against a defendant who "has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property." *See also* 740 ILCS 175/3(a)(1)(D).

39.   Fourth, the FCA's "reverse false claim" provision, 31 U.S.C. § 3729(a)(1)(G), imposes liability against a defendant who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *See also* 740 ILCS 175/3(a)(1)(G).

40.   Liability under the above provisions of the FCA subjects a defendant to treble

actual damages, imposition of a civil penalty ranging from $5,500-$23,331[5] for each false

or fraudulent claim, and payment of attorneys' fees and costs. 31 U.S.C. §§ 3729(a)(1),

3730(d)(1) and (2); *see also* 740 ILCS 175/3(a)(1); 740 ILCS 175/4(d)(1) and (2).

41. The "knowledge" element of the FCA is defined as (1) "actual knowledge of

the [falsity of the] information"; (2) "deliberate ignorance of the truth or falsity of the

information"; or (3) "reckless disregard of the truth or falsity of the information" provided

to the Government. 31 U.S.C. § 3729(b)(1)(A). No specific intent to defraud need be

shown. 31 U.S.C. § 3729(b)(1)(B). *See also* 740 ILCS 175/3(b)(1).

42. Under the FCA, the term "claim" means any request or demand for money,

whether under a contract or otherwise, presented to an officer, employee, or agent of the

United States. 31 U.S.C. § 3729(b)(2)(A)(i). A "claim" is also a request or demand for

money made to a contractor or other recipient if (a) the money is to be spent or used on the

Government's behalf or to advance a Government program or interest and (b) if the

Government provides, has provided, or will reimburse such contractor or other recipient

for any portion of the money requested or demanded. 31 U.S.C. § 3729(b)(2)(A)(ii). *See*

*also* 740 ILCS 175/3(b)(2).

---

[5]

| FCA Civil Penalty - Effective Dates | Minimum | Maximum |
|---|---|---|
| June 20, 2020 – | $11,665 | $23,331 |
| January 30, 2018 – June 19, 2020 | $11,181 | $22,363 |
| February 4, 2017 – January 29, 2018 | $10,957 | $21,916 |
| August 1, 2016 - February 3, 2017 | $10,781 | $21,563 |
| August 1999 - August 1, 2016 | $5,500 | $11,000 |

*See* 28 C.F.R. § 85.5; 85 Fed. Reg. 37,004-10 (June 19, 2020).

11

43.     The term "obligation" in the FCA is defined as "an established duty, whether or not fixed, arising from an express or implied contractual, … relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). *See also* 740 ILCS 175/3(b)(3).

44.     The FCA defines "material" objectively to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). *See also* 740 ILCS 175/3(b)(4). The Supreme Court reaffirmed the natural tendency materiality test—even as to subsection (a)(1)(A), which does not explicitly use the term—and described a holistic approach to analyzing it. *See Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016).

### B.  Medicare, Parts A, B, and D

45.     Medicare is federally funded health insurance for persons aged 65 years or older, certain persons with disabilities, and persons with end-stage renal disease. The United States Department of Health and Human Services (HHS) is responsible for the overall administration and supervision of the Medicare program, which CMS directly administers. CMS also is responsible for making payments to providers that are enrolled to participate in Medicare and that submit claims for payment on behalf of Medicare beneficiaries.

46.     Medicare is divided into four parts. Medicare Part A authorizes payment for institutional care, including hospital, skilled nursing facility (SNF), hospice, and home health care. *See* 42 U.S.C. § 1395d; 42 C.F.R. §§ 409.1 *et seq*. As relevant here, Part A

12

pays for stays in a SNF up to 100 days after a three-day hospitalization. *See* 42 U.S.C. § 1395d.

47.     Medicare Part B authorizes payment for outpatient health care expenses, including physician fees. *See* 42 U.S.C. § 1395k; 42 C.F.R. 410.1 *et seq*.

48.     Together, Parts A and B are typically characterized as Original Medicare or Fee-for-Service (FFS) Medicare.

49.     Part D is the Medicare prescription drug program that a beneficiary can select as a stand-alone prescription drug plan (PDP) or as part of the package of benefits included in a Medicare Advantage plan, as discussed below. 42 U.S.C. § 1395w-101; 42 C.F.R. §§ 423.1 *et seq*.

**C. Medicare Part C**

50.     Part C, called Medicare Advantage (MA), is an alternative to FFS Medicare. Under the MA program, a Medicare beneficiary can opt out of the traditional Medicare program (Parts A and B) and instead enroll in an MA plan managed by an MA Organization. *See* Subchapter XVIII of the Social Security Act, 42 U.S.C. §§ 1395w-21 to 1395w-28.

51.     CMS reimburses MA plans differently than traditional Medicare. Under Part C, Medicare pays a private health insurance company, often called a managed care organization (MCO), to administer Medicare benefits by delivering health care to beneficiaries who select this option. 42 U.S.C. § 1395w-21; 42 C.F.R. §§ 422.1 *et seq*. Part C plans provide all services encompassed in Parts A and B, but can also offer additional

benefits. However, Part C plans can also restrict the network from which a beneficiary can choose doctors and hospitals.

52.     Part C plans can be structured as health maintenance organizations, preferred provider organizations, provider-sponsored organizations, or private FFS plans.

53.     CMS pays the entities that operate Part C plans under a managed care model. CMS determines a set capitation payment each year for the complete care of the beneficiary, who also may pay a monthly premium and copayments (albeit generally less that what a beneficiary would pay if covered under FFS Medicare). By statute, capitation payment rates must be "actuarially sound." *See* 42 C.F.R. §§ 438.2 and 438.6(c)(2)(i). CMS calculates the rates at the beginning of a contract term based on historic costs of providing health care to the particular population; and those amounts are further adjusted based on the health status of each beneficiary (called risk-adjusted payments). 42 U.S.C. § 1395w-23; 42 C.F.R. § 422.306, 308.

54.     An MCO health plan under Part C then contracts with providers to provide the required health care services for those who enrolled in the specific Medicare Advantage plan. The MCO pays the providers from the capitation payments received from CMS. The MCO keeps whatever amount remains after the MCO pays the providers. Conversely, if the costs of providing services exceeds the capitation payment, the MCO must cover those costs. Accordingly, these are called "risk contracts." 42 C.F.R. § 438.2.

### D.  Medicaid

55.     Medicaid is a joint federal-state program that provides health care benefits primarily for low-income individuals and families. 42 U.S.C. § 1396a(a). Authorized under

14

the Social Security Act, Medicaid is administered by each state in compliance with federal requirements under the Medicaid statute and regulations. *See* 66 Fed. Reg. 857 ("The States operate Medicaid programs in accordance with Federal laws and regulations and with a State plan that we approve."). To qualify for federal funding under Medicaid, state programs must cover hospital and physician services at a minimum. 42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)(2), (5). Medicaid may also provide coverage for services not included in Medicare, including long-term nursing facility care, personal care, transportation to medical services, home- and community-based services, and dental, vision, and hearing services.

56. Once HHS approves a state's Medicaid plan, the state becomes eligible to receive federal matching funds, called "federal financial participation" (FFP). 42 U.S.C. § 1396b(a)(1). The FFP amount is derived from a state's "federal medical assistance percentage" (FMAP). The FMAP is calculated based on the per capita income for the state compared to the national average, but in no instance can it be less than 50%. 42 U.S.C. § 1396d(b); 42 C.F.R. § 430.30(d)(3) & (4).

57. The federal government then agrees to reimburse the state in the amount of the state's FMAP proportion of the state Medicaid expenditures. The "reimbursement" actually takes the form of advance payments made quarterly to the state consisting of the FMAP applied to the state's Form CMS 37 (Medicaid Program Budget Report) submitted for the quarter, which is an estimate of allowable Medicaid expenditures for that quarter. 42 U.S.C. § 1396b(d)(1); 42 C.F.R. § 430.30(b).

15

58.     During the 2013-2016 timeframe pertinent to the claims in this lawsuit, the Illinois FMAP ranged from 50.00% to 50.89%, and Illinois' Medicaid spending ranged from $15.7 billion in 2013 to $19.3 billion in 2016.[6]

59.     Since 2018, Illinois has worked toward having MCOs provide 80% of the state's Medicaid coverage.[7]

**E.  Dual Eligibles**

60.     "Dual eligible" persons meet the eligibility requirements for both Medicare and Medicaid. These two programs will likely cover most of their health care needs. Generally, dual eligibles select either Original Medicare or a Medicare Advantage plan and their prescription drugs are covered by Medicare. They are also eligible for the Medicaid care available under their state's Medicaid plan. *See* 42 U.S.C. § 1315b.

61.     For these beneficiaries, Medicare coverage is applied first, and Medicaid is generally the payer of last resort. However, Medicaid may cover some health care costs Medicare does not cover or covers only partially (e.g., nursing home care, personal care, and home- and community-based services). For example, Medicare will pay for 100 days of SNF care for a dual eligible following a hospitalization, and if the individual needs continued care after the 100 days, Medicaid may pick up those costs.

---

[6] https://ballotpedia.org/Medicaid_spending_in_Illinois (citing data from the Henry J. Kaiser Foundation).
[7] https://illinoiscomptroller.gov/financial-data/state-expenditures/medicaid/

V. **ILLINOIS MANAGED CARE PROGRAMS FOR MEDICAID RECIPIENTS AND DUAL ELIGIBLES WERE DESIGNED FOR INTEGRATED AND IMPROVED CARE DELIVERY.**

62.     CMS and HFS (together "the Government") have provided health care services to eligible persons within the State of Illinois through a number of programs, two of which are relevant here: the ICP and the MMAI.

A. **Integrated Care Program**

63.     The ICP was launched in select Illinois "collar"[8] counties in 2011. It provided services to seniors and persons with disabilities who are Medicaid-eligible, but not eligible for Medicare. A mandatory managed care program, the pilot program was expanded over time to 29 counties in five regions of Illinois. As relevant here, the program became operative in the central Illinois region[9] on April 1, 2013.

64.     The ICP's goal was a care delivery system that "brings together an Enrollee's Providers as an integrated care team to provide enrollees a more coordinated medical approach and keep the Enrollee healthier."[10] The services were intended to address enrollees' physical, behavioral and social needs. Potential enrollees living in particular contract areas could select the ICP MCO in which they wished to enroll; those who did not select were assigned by HFS to one of the available MCOs.

_____

[8] "Collar" counties in this instance include suburban Cook, DuPage, Kane, Lake, Kankakee, and Will counties.
[9] This region included McLean, Logan, DeWitt, Sangmon, Macon, Christian, Piatt, Champaign, Vermillion, Ford, Menard, Tazewell, Knox, Peoria, and Stark. (ICP, Attachment IV.)
[10] https://www2.illinois.gov/hfs/SiteCollectionDocuments/MCOManual.pdf at 5-6.

65.     MCOs participating in the ICP entered into risk contracts with HFS in which they received a capitated PMPM amount funded by Illinois Medicaid.

66.     The capitated PMPM amount varied depending on the health needs of the individual. To account for differing health needs, the population was divided into rate cells, generally stratified by geographic service area (collar counties and extension counties) and setting-of-care (Community,[11] Waiver,[12] Nursing Facility, Waiver Plus,[13] and Community Plus[14]).

67.     The ICP capitated rates also included an administrative cost allowance. In 2013, that allowance was comprised of 6% of the medical claim plus a fixed fee of $40 PMPM for nursing home and $25 PMPM for all other populations.

68.     Individual enrollees' capitation rates were further adjusted using an annually updated risk adjustment tool[15] employed by HFS. (ICP Contract (ICP),[16] § 7.4.1.)

69.     The ICP offered two "service packages" with corresponding capitation rates: Service Package I provided acute health services (i.e., physician, hospital and pharmacy

---

[11] Individuals are characterized in the "community" rate if they are age 19 and over, are not institutionalized, and are not participating in a § 1915(c) waiver program.
[12] A waiver is a program that provides community- and home-based services needed to allow individuals to remain in their own homes or in a community setting instead of in an institution.
[13] The "waiver plus" rate cell is used for persons who are making a transition from a nursing facility to a waiver program. It generally provides transitional support for three months.
[14] The "community plus" rate provides additional assistance to persons transitioning from a nursing facility to the community but who do not qualify for any waiver services. This rate is typically provided for three months.
[15] Chronic Illness and Disability Payment System.
[16] Citations are to the ICP and MMAI contracts signed by Defendants. Unless otherwise indicated, the citations to the ICP contract are the same for the contracts signed in 2013 and 2015.

services). (2013 ICP, § 5.1.1; Attachment I; 2015 ICP, § 5.2.1, Attachment I.) Service Package II, effective February 1, 2013, added a capitation rate for beneficiaries receiving long-term services and supports, as well as home- and community-based waiver services. (2013 ICP, § 5.1.2, Attachment II; 2015 ICP, § 5.2.2, Attachment II.) A contracted health plan received the capitation payment for both Service Package I and Service Package II for enrollees covered by both packages. (2013 ICP, § 5.1.2; 2015 ICP, § 5.2.2.)

70.    HFS retained a third-party consultant, Milliman, Inc.,[17] to provide actuarial and consulting services in the development of the capitation rates for the Medicaid components of the two ICP service packages. In simple terms, Milliman calculated the historical cost to the State of providing the individual required services in recent years. Those costs were then converted to a PMPM amount based on the services required for the different rate cells. That is, the capitation rate HFS would pay to a contractor was based on actuarially-determined anticipated expenses needed to provide required services in real life to the various rate-cell populations.

71.    Below are sample capitation rates for the ICP service packages 1 and 2 for particular periods during 2013.

_____

[17] Founded in 1947, Milliman is an independent international risk management, benefits and technology firm.

19

**Integrated Care Program for the Aged, Blind, and Disabled Non-Dual**
**Service Package I Capitation Rates by Region**
**March 1, 2013 to December 31, 2013[18]**

| Rate Cell | Collar Counties | Expansion Counties | Final Blended Rate |
|---|---|---|---|
| Community Residents | $ 880.38 | $ 986.66 | $ 890.59 |
| Developmentally Disabled Waiver | $663.56 | $570.10 | $655.70 |
| ICF/MR | $848.42 | $763.89 | $832.52 |
| Nursing Facility | $1,750.85 | $2,313.08 | $1,773.44 |
| Other Waiver | $1,821.35 | $1,640.26 | $1,786.59 |
| State Operated Facility | $ 117.66 | $ 117.66 | $ 117.66 |

**PMPM Capitation Rates effective February 1, 2013 through December 31, 2013**
**Integrated Care Program: Service Package II[19]**

| Rate Cell | December 2011 Enrollment | Proposed Capitation Rate |
|---|---|---|
| Nursing Facility | $975 | $3,750.19 |
| Other Waiver | $2,834 | $1,696.12 |
| Other Waiver – Plus Rate | N/A | $3,065.50 |
| Community – Plus Rate | N/A | $375.02 |

72. The table below, which combines the appropriate amounts from Service Packages I and II for the nursing facility, other waiver, and community rate cells, shows that the ICP capitation rates for persons in nursing facilities in 2013 were significantly

---

[18] Milliman, March 1, 2013 Service Package I Capitation Rates—Integrated Care Program—V2.
https://www2.illinois.gov/hfs/SiteCollectionDocuments/ICPRateCertificationLetter.pdf
[19] Milliman, Integrated Care Program Capitation Rates—Service Package II--.
https://www2.illinois.gov/hfs/SiteCollectionDocuments/ICPSP2RateCertificationLetter.pdf

higher than persons who receive services under other waivers[20] or living in the community, even without any risk adjustments.

| ICP Resident Type | Package I | Package II | Total |
|---|---|---|---|
| Nursing Facility | $1,773.44 | $3,750.19 | $5,563.23 |
| Other Waiver | $1,786.59 | $1,696.12 | $3,482.71 |
| Community | $ 880.38 | -- | $ 880.38 |

An MCO operating under these ICP Service Package rate cells accordingly receives $2,080.52 more for an enrollee in a nursing facility than an enrollee in the other waiver rate cells.

73.    A primary difference between the nursing facility enrollee and the other waiver enrollee is that the former is actually residing in a nursing facility. Since the ICP contract only requires SNFist services in nursing facilities, the logical inference is that SNFist services comprise a significant portion, if not all, of the difference between the two rate cells. Even more dramatic is the difference between the nursing facility and community rate cells—$4,682.85.

74.    The capitation rate paid for enrollees is based on their residential status as of the first day of the month. (ICP, § 7.1.) HFS determines the proper rate cell for the enrollees. (ICP, § 7.1.) That is, if a person is in a nursing facility on the first day of the month, HFS pays the MCO the nursing facility capitation rate for that person that month.

---

[20] The "Other Waiver" population are those persons in waiver programs, *other than* individuals with developmental disabilities (DD) or intermediate care facility/developmentally disabled (ICF/DD) waiver, who participate in waiver programs in Illinois that allow them to receive community and home-based services as an alternative to institutional care. These waiver programs include persons who are elderly, with a brain injury, HIV or AIDS, medically fragile, technology dependent children and persons with disabilities.

75.     An MCO under an ICP contract with HFS receives payment of the monthly capitation rate for the enrollees at mid-month. HFS gives the MCO electronic notice of its enrollees on a monthly basis by identifying them electronically in what is called an 834 Audit File that is retrieved by the Contractor and an 834 Daily File that shows changes in enrollment within the month. (ICP, § 4.1.) The contractor then accepts potential new enrollees, updates its electronic systems to reflect the information in the audit file, and, for new enrollees, sends a "welcome packet" within a designated time frame. (ICP, §§ 4.7, 4.8.)

76.     HFS makes available an 820 Payment File that identifies the payments made to the contracting MCO and the rate cells of the Enrollees for whom HFS is paying. The Contractor further has 30 days to notify HFS of any discrepancies, which the Contractor and HFS then work together to resolve. (ICP, § 7.3.)

77.     The ICP contract makes it clear that the Contractor must provide *all* services identified in the contract: "Covered Services shall be provided in the amount duration and scope as set forth in 89 Ill. Adm. Code, Part 140 and this Contract, and shall be sufficient to achieve the purposes for which such Covered Services are furnished." (ICP, § 5.1.)

78.     The ICP contract further requires the Contractor to provide notice if unable to provide the contractually required services: "Contractor shall notify Department in writing as soon as practicable, but no later than five (5) days, following a change in Contractor's network of Affiliated Providers that renders Contractor unable to provide one (1) or more Covered Services within the access to care standards set forth in Section 5.6." (ICP, § 5.1.)

79.     In addition, the ICP contract includes a variety of monetary sanctions (*e.g.,* civil money penalties, late fees, performance penalties) for a Contractor's failure to substantially comply with the contract's terms. HFS reserves the right to terminate the contract, particularly when noncompliance is willful, egregious, persistent, or part of a pattern. (ICP, § 7.16.) Misrepresentation or falsification of information provided to HFS or CMS may result in imposition of a civil penalty of $10,000 to $50,000. (ICP, § 7.16.8.) Also, a failure to provide a required covered service or any other failure to comply with material terms of the contract can result in a civil penalty ranging from $5,000 to $25,000, suspension of enrollment of potential enrollees, or both. (ICP, §§ 7.16.11, 7.16.14.)

80.     In 2018, the Illinois Department of Human Services and HFS brought together several programs into a single Medicaid managed care program called HealthChoice Illinois. The ICP then became a part of HealthChoice Illinois.

### B.  Medicare-Medicaid Alignment Initiative

81.     In 2011, CMS launched the Medicare-Medicaid Alignment Initiative as a demonstration designed to improve health care for dually-eligible beneficiaries by aligning the financing of the two programs and integrating "primary, acute, behavioral health and long-term services and supports" for this population. The goal is to "to integrate benefits to create a unified delivery system that is easier for beneficiaries eligible for both Medicare and Medicaid (Dual Eligibles) to navigate." The demonstration involves two models: (1) a capitated model in which a state, CMS, and a health plan enter into a three-way contract and "the plan receives a prospective blended payment to provide comprehensive,

23

coordinated care," and (2) a managed FFS model.[21]

82.    On February 22, 2013, CMS approved Illinois' participation in the MMAI using the capitated model.

83.    In March 2014, Illinois began providing managed care under its MMAI in the Chicagoland area and central Illinois to dual eligibles who enrolled in the demonstration.

84.    The MMAI program was not folded into HealthChoice Illinois and continues to operate as a capitated model MMAI demonstration.

85.    As with the ICP, MCOs participating in the MMAI enter into risk contracts with CMS and HFS in which they receive a capitated amount PMPM funded by CMS and Illinois Medicaid, with each making payments for its respective components of the rate (CMS: Medicare Parts A/B and D components; Illinois: Medicaid component).

86.    The Contractor receives three monthly payments for each enrollee: one from CMS for Medicare Parts A and B, one from CMS for Medicare Part D, and a third from HFS for the Medicaid component. (MMAI Contract (MMAI), § 4.1.1.)

87.    The Medicare component of the capitation rate for Parts A/B services consists of a monthly base amount calculated annually as a PMPM standardized amount for each county involved in the demonstration. (MMAI, § 4.2.2.) "The Medicare baseline spending for Parts A/B are a blend of the Medicare Fee for Service (FFS) standardized

---

[21] https://www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and-Medicaid-Coordination/Medicare-Medicaid-Coordination-office/FinancialAlignmentInitiative/FinancialModelstoSupportStatesEffortsinCareCoordination

county rates and the Medicare Advantage projected payment rates for each year, weighted by the proportion of the target population projected to otherwise be in each program in the absence of the Demonstration." (MMAI, § 4.2.2.2.1.)[22]

88.     The Medicare Part A/B Rates for the MMAI were determined by county. Available data for 2015 shows that the monthly rates for the demonstration counties in Illinois ranged from $736.60 in Menard County, to $805.07 in Ford County, to $857.67 in Cook County.[23]

89.     The Medicare base amount is then risk adjusted using the Medicare Advantage CMS-HCC Model for Parts A and B. (MMAI, § 4.2.4.1.)

90.     For the Part D rate for 2015, Medicare provided a prospective payment totaling $180.19 PMPM applicable to enrollees in all involved counties, which amount is 100% cost reconciled after the payment year ends.[24]

91.     The Medicaid component of the MMAI capitated amount varied depending on the health needs of the individual. The MMAI rate cells were stratified by age (21-64 and 65+), geographic service area (greater Chicago and central Illinois), and setting-of-care (nursing facility, other waiver,[25] waiver plus, community, and community plus). (MMAI, § 4.2.1.1.)

---

[22] The calculations involved in determining the Part D component (not pertinent to the services at issue in this case) are described in the MMAI contract at § 4.2.2.3.
[23] Medicare-Medicaid Alignment Initiative, CY 2015 Final Rate Report, March 20, 2015. https://www2.illinois.gov/hfs/SiteCollectionDocuments/CY15ILRateReport.pdf
[24] Medicare-Medicaid Alignment Initiative, CY 2015 Final Rate Report, March 20, 2015. https://www2.illinois.gov/hfs/SiteCollectionDocuments/CY15ILRateReport.pdf
[25] As with the ICP, the "Other Waiver" population generally are those persons in waiver programs, *other than* individuals receiving developmental disabilities services.

92. As with the ICP, HFS retained Milliman to provide actuarial and consulting services in the development of the capitation rate for the Medicaid component of the MMAI capitated amount. Below are the capitation rates for the calendar year 2015, which show that the Medicaid component of the capitation rates for persons in nursing facilities is significantly higher than persons living in the community or who receive services under waivers that do not involve alternatives to institutional care.

| MMAI MEDICAID COMPONENT DEMONSTRATION CAPITATION RATES EFFECTIVE CALENDAR YEAR 2015[26] | | |
|---|---|---|
| Rate Cell | Greater Chicago | Central Illinois |
| *Age 21-64* | | |
| Community | $ 143.82 | $ 141.18 |
| Community – Plus Rate | $ 340.23 | $ 302.12 |
| Nursing Facility | $ 3,402.32 | $ 3,021.15 |
| Other Waiver | $ 1,792.49 | $ 1,604.32 |
| Other Waiver – Plus Rate | $ 2,865.71 | $ 2,548.88 |
| | | |
| *Age 65+* | | |
| Community | $ 59.51 | $ 69.12 |
| Community – Plus Rate | $ 338.56 | $ 291.22 |
| Nursing Facility | $ 3,385.64 | $ 2,912.19 |
| Other Waiver | $ 1,096.16 | $ 1,061.51 |
| Other Waiver – Plus Rate | $ 2,622.48 | $ 2,295.30 |

93. The table below, which combines the appropriate amounts for Medicare A/B and D and the Medicaid rate for a person in Ford County in 2015, shows that the MMAI capitation rates were significantly higher for persons in nursing facilities than for persons who receive services under other waivers or living in the community, even without any risk adjustments.

---

[26] https://www2.illinois.gov/hfs/SiteCollectionDocuments/CY15ILRateReport.pdf

| Age | MMAI Residence Type | Medicare A/B | Medicare D | Medicaid | Total |
|---|---|---|---|---|---|
| 65+ | Nursing Facility | $805.07 | $180.19 | $2,912.19 | $3,897.45 |
| 65+ | Waiver | $805.07 | $180.19 | $1,061.51 | $2,046.77 |
| 21-64 | Nursing Facility | $805.07 | $180.19 | $3,021.15 | $4,006.41 |
| 21-64 | Waiver | $805.07 | $180.19 | $1,604.32 | $2,589.58 |
| 65+ | Community | $805.07 | $180.19 | $69.12 | $1,054.38 |
| 21-64 | Community | $805.07 | $180.19 | $141.18 | $1,126.44 |

94.     An MCO operating under these MMAI rate cells accordingly receives $1,416.83 more for an age 21-64 Enrollee in a Nursing Facility than an enrollee in the age 21-64 waiver rate cell, even without risk adjustments; and receives $1,850.68 more for a 65+ enrollee in a nursing facility than an enrollee in the waiver rate cell, even without risk adjustments. Again, the logical inference is that SNFist services comprise a significant portion, if not all, of the difference between the two rate cells. And again, the difference between the nursing facility rate and the community rate is substantial—$2,879.97 for age 21-64, $2,843.07 for age 65+.

95.     As with the ICP, the Medicaid capitation rate for an MMAI enrollee is based on the enrollee's residential status as of the first day of the month. (MMAI, § 4.2.1.1.)

96.     An MCO under an MMAI contract with HFS receives payment of the monthly Medicare capitation rate for the enrollees at mid-month. HFS gives the MCO electronic notice of its enrollees on a monthly basis by identifying them electronically in what is called an 834 Audit File that is retrieved by the Contractor and an 834 Daily File that shows changes in enrollment within the month. The Contractor then accepts potential new enrollees and, for new enrollees, sends a "welcome packet" within a designated time frame. (MMAI, §§ 2.3.1.9, 2.3.1.10.)

27

97.    HFS makes available an 820 Payment File that identifies the payments made to the contracting MCO and the rate cells of the enrollees for whom HFS is paying. The Contractor further has 30 days to notify HFS of any discrepancies, which the Contractor and HFS then work together to resolve. (MMAI, § 4.6.1.1.)

98.    The MMAI contract requires the Contractor to "[c]omply with all provisions set forth in this Contract." (MMAI, § 2.1.1.) But more emphatically, the contract states: "The Contractor must authorize, arrange, integrate, and coordinate the provision of all Covered Services for its Enrollees. . . . Covered Services must be available to all Enrollees twenty-four (24) hours a day, seven (7) days a week, as authorized by the Contractor. . . . Covered Services shall be provided in the amount, duration and scope as set forth in 89 Ill. Adm. Code, Part 140 and this Contract, and shall be sufficient to achieve the purposes for which such Covered Services are furnished."

99.    The MMAI contract further states the Contractor "must" provide notice "of all changes affecting the key functions for the delivery of care, the administration of its program, or its performance of Contract requirements." It requires 30 days' notice prior to "any significant change to the manner in which services are rendered to Enrollees," and notice five business days prior to the effective date of any other changes. (MMAI, § 5.1.1.)

100.    In addition, and like the ICP, the MMAI contract includes a variety of remedies for failure to comply with the contract's terms, as well as misrepresentation or falsification of information provided to CMS or HFS. (MMAI, § 5.3.14.) They include financial penalties (*see* 42 C.F.R. § 438.704), suspension of enrollments or payments, and termination. (MMAI, §§ 5.3.14.2; 5.5.)

### C.  Requirement to Provide Truthful "Encounter Data"

101.  MCOs, including those under ICP and MMAI contracts, are required to verify the services provided to their enrollees by regularly submitting "Encounter Data"[27] to HFS, which data identifies Medicaid-covered services reported to the MCO by its providers. (ICP, Attachment XIII; MMAI, §2.17.) Encounter data is generally reported on a monthly basis. (ICP, Attachment XIII; MMAI, § 2.17.2.5.) The data reported must be complete, accurate, truthful, and in accordance with all federal and state laws, regulations, policies, and contracts. *See* 42 C.F.R. §§ 438.604 and 438.608 (ICP, Attachment XIII; MMAI, §§ 2.17.1, 2.17.2.6.)

102.  HFS, in turn, submits quarterly reports to CMS with respect to MCO services (Form CMS-37) and expenses (Form CMS-64), including an attestation that only allowable expenditures are included consistent with the law, policies, and the state plan approved by CMS.

### D.  Conditions of Payment Required by the ICP and MMAI Contracts

103.  Compliance with certification and program integrity requirements in the ICP and MMAI is an express condition of payment: "[a]s a condition for receiving payment under the Medicaid managed care program, an MCO … must comply with the applicable certification, program integrity and prohibited affiliation requirements of this subpart." 42 C.F.R. § 438.602.

---

[27] "Encounter data" is generally defined as a record of services provided through Medicaid or Medicaid (similar to information required for FFS payment) under a risk basis payment methodology and submitted to CMS and HFS. (ICP, § 1.55, MMAI, § 1.52.)

104.   In addition, under the ICP and MMAI, a contractor is not entitled to enroll any beneficiaries until it has successfully completed a "Readiness Review." (ICP, § 4.17 (contractor must be "ready to provide services to Enrollees in a safe and efficient manner"); MMAI, § 2.2.1.2.3 (contractor must be "ready and able to perform its obligations under the contract.")).

105.   The ICP and MMAI require contractors to monitor and address compliance in multiple ways, including:

- Participation in a "readiness" review that includes providing assurances that the contractor is ready and able to comply with contract requirements (2013 ICP § 2.2.1.2.2.8; 2015 ICP, § 4.17; MMAI, § 1.130, 2.2.1.3.1, 2.7.1.1.)

- Quarterly disclosure of fraud or abuse of the Medicaid program. (2013 and 2015 ICP, § 5.30.1.4 (including certification by contractor that it has no knowledge or suspicion of conduct that constitutes fraud or abuse); MMAI, § 2.13.10.1 (quarterly report of "all Quality Assurance findings, conclusions, recommendations, actions taken, results or other documentation relative to QA").)

- Implementation of compliance and quality assurance programs to detect and correct fraud, waste and abuse (2013 ICP, § 5.30, 2015 ICP § 5.31; MMAI §§ 2.1.7, 2.13.1.6.)

- Provision of an annual report to the Government regarding fraud monitoring and fraud, waste and abuse (2013 ICP, § 5.23, Attachment XI, § 3.g.ii.g) and r), 2015 ICP § 5.24, Attachment XI, § 3.g.ii.f) and q), Attachment XIII "Fraud and Abuse; MAI, §§ 2.13.2.7.2, 2.13.2.7.2.6, 2.13.2.7.2.17.)

- Annual demonstration that its network is adequate to provide all enrollees with the services required under the contract. (2013 ICP, Attachment XI, § 3.g.ii.e), 2015 IDP, Attachment XI, § 3.g.ii.d; MMAI, § 2.7.1.1.)

## VI. SNFIST SERVICES ARE A KEY REQUIRED COMPONENT IN THE ICP AND MMAI CONTRACTS.

106.  Nursing facilities play a significant role in the wellbeing of Medicare and Medicaid beneficiaries. For many, they provide essential medical or nursing care that fills the gap between being hospitalized and being able to return to and live in the community. For persons unable to live in the community, the quality of nursing facility services is critical to their ongoing health and ability to enjoy life.

107.  Through HFS, the State of Illinois provides medical benefits under its Medicaid program to some 55,000 nursing facility residents eligible under its Medicaid program.[28] The services are provided in nursing facilities licensed by the Illinois Department of Public Health and are intended to meet the needs of "the infirm and chronically ill." 210 ILCS 45/1-113.

108.  Over the last decade or so, the focus on the SNFist specialization has grown because of the reality that nursing home populations are "becoming increasingly older, sicker, and more disabled" requiring "ongoing competent medical attention."[29] These specialists provide care that addresses the specific and unique health care needs of persons in nursing facilities.[30] Accordingly, the specialists are called "SNFists," "long-term-care specialists," "post-hospitalists," or other similar terms.[31]

---

[28] https://www2.illinois.gov/hfs/MedicalClients/Pages/ltc.aspx

[29] Marshall B. Kapp, *The Liability Environment for Physicians Providing Nursing Home Medical Care: Does It Make A Difference for Residents?*, 16 ELDER L.J. 249, 250–51 (2009) (collecting citations);

[30] https://www.fiercehealthcare.com/healthcare/rising-snfist-could-curtail-readmissions

[31] This complaint uses the term "SNFist" because that is the term used in the relevant contracts.

109.    The ICP and MMAI contracts define SNFists as "a Physician or APN [Advanced Practice Nurse] licensed under the Illinois Nurse Practice Act who is part of an organized system of care, meaning a coordinated group working together, whose entire professional focus is the general medical care of individuals residing in a Nursing Facility and whose activities include Enrollee care oversight, communications with families, significant others, PCPs, and Nursing Facility administration." (ICP, § 1.142; MMAI, § 1.138.)

110.    The goals of a SNFist program include coordinating high quality care for individuals in nursing facilities following a hospital discharge, preventing unnecessary emergency room visits and hospitalizations or re-admissions for persons residing in nursing facilities, preventing unnecessary testing and treatment, and ensuring review and coordination of medication use.[32] That is, SNFists perform valuable long-term care that avoids hospitalizations and potentially enables patients to return to their communities.

111.    Besides the impact on health and quality of life for persons in nursing facilities, the achievement of SNFist goals in nursing facilities can also save significant Medicare and Medicaid dollars by, among other things, ensuring appropriate medication use and reducing hospital readmissions and emergency room visits.

112.    The Illinois legislators recognized the importance of SNFists by specifically identifying them in the Illinois Public Aid Code codifying nursing home patient's rights

---

[32] http://blog.richterhc.com/benefits-of-hiring-an-snfist;
https://www.cbha.net/Resources/Documents/ICP%20Final%202015%20Report%20-%20August%202015.pdf at 64-65.

with respect to managed care, specifically the MMAI. The Code defines a "SNFist" as a "a medical professional specializing in the care of individuals residing in nursing homes employed by or under contract with a MCO." 305 ILCS 5/5F-10. It further defines a "Medical Professional" as "a physician, physician assistant or nurse practitioner." *Id.*[33] The legislation identifies a nursing home's failure to grant reasonable and timely access to SNFists as a material breach of the contract that could result in termination or refusal to renew a contract. 305 ILCS 5/5F-20(c).

113.    Confirming the importance and value of providing coordinated care and, in particular, SNFist services to persons in nursing facilities, both the ICP and MMAI contracts mandate SNFist Programs.

114.    The ICP contract explicitly requires the signing contractor to provide SNFist services through a "SNFist Program" described as follows:

> **5.5.10    SNFist Program.** Contractor *shall* provide SNFist services, either through direct employment or a sub-contractual relationship. The SNFist program *shall* provide intensive clinical management of Enrollees in Nursing Facilities. (Emphasis added.)
>
> **5.5.10.1**    When appropriate or necessary, the Care Management team will include an additional facility-based Provider (Physician or nurse practitioner) who will deliver care in identified Nursing Facilities.
>
> **5.5.10.2**    For all other Enrollees, Care Management through the SNFist program shall be performed by either telephonic or field-based Registered Nurses or licensed clinical social works who will work within each assigned Nursing

---

[33] Effective June 16, 2014, the Illinois General Assembly amended the Illinois Public Aid Code (98-0651), to add an article titled "The Medicare-Medicaid Alignment Initiative (MMAI) Nursing Home Residents' Managed Care Rights Law."

> Facility to provide Care Management and care coordination activities.

(2013 ICP; 2015 ICP 5.6.10, with subdivisions 5.6.10.1 and 5.6.10.2.)

115. In basically identical terms, the MMAI also mandates providing a SNFist program:

> 2.5.6   SNFist Program. The Contractor *shall* provide SNFist services, either through direct employment or a sub-contractual relationship. The SNFist program *shall* provide intensive clinical management of Enrollees in Nursing Facilities. (Emphasis added.)
>
> > 2.5.6.1   When appropriate or necessary, the ICT [Interdisciplinary Care Team] will include an additional facility-based Provider (Physician or nurse practitioner) who will deliver care in identified Nursing Facilities.
> >
> > 2.5.6.2   For all other Enrollees, Care Management through the SNFist program shall be performed by either telephonic or field-based Registered Nurses or licensed clinical social workers who will work within each assigned NF to provide Care Management and care coordination activities

116. Before the MMAI was launched on October 1, 2013, CMS and HFS signed a Memorandum of Understanding (MOU)[34] to detail "the principles under which DMS and Illinois plan to implement and operate the [MMAI] Demonstration." (MOU at 5.) The MOU articulated a number of "key objectives" including to "improve, quality, rebalance long-term services and supports . . . and achieve cost savings for the State and Federal

---

[34] The MOU was titled "Memorandum of Understanding (MOU) *Between* The Centers for Medicare & Medicaid Services (CMS) *and* The State of Illinois Regarding a Federal-State Partnership to Test a Capitated Financial Alignment Model for Medicare-Medicaid Enrollees, Illinois Medicare-Medicaid Alignment Initiative." https://www.cms.gov/medicare-medicaid-coordination/medicare-and-medicaid-coordination/medicare-medicaid-coordination-office/downloads/ilmou.pdf

government through improvements in care and coordination." (*Id.* at 3-4.) It further noted that "Illinois has one of the highest rates of potentially avoidable hospital admissions among Medicare-Medicaid beneficiaries nationally" as well as "one of the highest proportions of spending on institutional services compared to home and community-based services." (*Id.* at 4.) Accordingly, the MOU indicated that "CMS and the State expect this model of integrated care and financing to, among other things, reduce avoidable hospital admissions, improve quality of care and reduce health disparities, meet both health and functional needs of Enrollees, and improve transitions between care settings." (*Id.*)

117. Consistent with the expectations expressed above, the MOU identified 11 "Delivery System Requirements" in § IV of Appendix 7, titled "Demonstration Parameters." (*Id.* at 55, 60.) One of them—"Requirements for Care Transitions"— mandated that "Demonstration Plans *will be required* to operate a SNFist program. The SNFist program *must be designed* to improve health outcomes among nursing home residents, particularly those with high rates of hospitalization." (MOU at 60, emphasis added.)

118. In 2014, CMS retained an independent research institute to monitor the MMAI, including a specific plan for the Illinois MMAI, which began on March 1, 2014. Issued in April 2014, the "Illinois Evaluation Design Plan" (Design Plan)[35] singles out

---

[35] "Measurement, Monitoring, and Evaluation of State Demonstrations to Integrate Care for Dual Eligible Individuals: Illinois Evaluation Design Plan, "https://www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and-Medicaid-Coordination/Medicare-Medicaid-Coordination-Office/FinancialAlignmentInitiative/Downloads/ILEvalPlan.pdf .

SNFist programs in a separate paragraph of its Summary of Demonstration, noting that demonstration plans "are required to operate SNFist programs to provide intensive clinical management for enrollees in nursing facilities. . . . The intent is to improve health outcomes in nursing facilities, particularly those with high rates of hospitalization (Illinois three-way contract, 2013, p. 50; Illinois MOU, 2013, pp. 66–67)." (Design Plan at 4.)

119.    The evaluation design further identifies "the core quality measures to be included in the evaluation of the Illinois demonstration." (*Id.* at 43.) The first measure on the list is "All-cause readmission, 30-day all-cause risk-standardized readmission rate." (*Id.* at 44.) The list also includes "Avoidable ED visits, Preventable/avoidable and primary care treatable ED visits," and "ED visits excluding those that result in death or hospital admission."[36] (*Id.* at 46.) The congruence of these goals with the goals of a SNFist program confirm the value placed on SNFist programs in achieving the goals of the MMAI.

## VII.    FACTUAL ALLEGATIONS

### A. MCO Health Alliance Entered into ICP and MMAI Contracts that Include the Obligation to Provide a SNFist Program for Its Nursing Facility Enrollees.

120.    In business since 1989, Health Alliance is an Illinois stock insurance corporation that currently offers health care coverage to employer groups and individuals as well as Medicare Advantage plans. Its health plans include nearly a quarter-million members in Illinois, Iowa, Indiana, Ohio, and Washington.[37]

---

[36] *Id.* at 44, 46.
[37] https://carle.org/careers/health-alliance

121. Incorporated on December 30, 2013, Health Alliance Connect is a not-for-profit corporation, described by Health Alliance as an "affiliate."

122. Health Alliance and Health Alliance Connect share the same office address and, on information and belief, common executives.

123. As a pre-requisite to participating in the MMAI, Health Alliance responded to a request for proposal (RFP) by presenting an "Offer to the State of Illinois, Medicare-Medicaid Alignment Initiative/2013-24-003" (Offer) on June 18, 2012. An MCO's offer in response to an RFP allows the Government to ensure that a contractor has the resources and capability to comply with the requirements of the contract and applicable law. *See* 42 C.F.R. § 438.206.

124. In the Offer, Health Alliance provided information about its business, including that it had 32 years' experience administering managed care plans, and at that time it administered coverage for more than 16,000 Medicare beneficiaries, 20,000 individuals and their families, and close to 280,000 enrollees enrolled through employer groups. (Offer, § 3.2.1.)

125. Health Alliance characterized itself in the Offer as flexible in administering many different benefit designs. It touted its "care management program," which it described as integrating a basic structure of quality care management programs and services. It noted that it was the number one health plan in Illinois based on certain quality rankings and attributed that ranking to a combination of commitment to quality coverage and care with "highly acclaimed customer service." (Offer, § 3.2.1.1.)

37

126.    Given the importance of SNFist programs to the MMAI, the RFP asked Health Alliance specifically to "Describe the components and operation of the SNFist program you are required to operate." (Offer, § 3.2.2.3.) Claiming that it followed "a management principle that post-acute care should be delivered in a network with maximum quality controls," Health Alliance indicated that it would provide a "SNFist program" that it expected "to be achieved with a caseload ratio of 50 members to 1 Advanced Practice Professional (APP). (Offer, § 3.2.2.3.2.) It stated that "direct care in the facilities would be available 24/7 "as a principle of quality management," and further noted that the "SNFist program team will be fully integrated with the interdisciplinary care team." (Offer, § 3.2.2.3.5.)

127.    Effective September 1, 2013, Health Alliance signed a contract with HFS to provide health care for certain Medicaid beneficiaries through the ICP.

128.    Health Alliance signed amendments to the 2013 ICP Contract on November 19, 2013, February 27, 2014, September 18, 2014, May 7, 2015, and June 29, 2015. Each time Health Alliance signed an amendment to the 2013 ICP Contract, it confirmed the following: "All other terms and conditions of the Contract shall remain in full force and effect." (*See, e.g.*, 2013 ICP, Amendment 1, PDF at 235.)

129.    Not long after signing the initial 2013 ICP contract, Health Alliance also signed a three-way MMAI contract between HFS, CMS, and itself, effective November 15, 2013, and ending on December 31, 2015, with the possibility of extension. (MMAI, § 5.7.1.)

130.   On June 29, 2015, Health Alliance Connect signed a first amendment to another contract with HFS that appears to replace the 2013 ICP contract and was effective at least by August 12, 2015.[38] (2015 ICP, Amendment 1, PDF at 238.)

131.   Health Alliance Connect signed three more amendments to the 2015 ICP Contract on September 10, 2015, December 23, 2015, and August 9, 2016. Each time Health Alliance signed an amendment to the 2015 ICP Contract, it confirmed the following: "All other terms and conditions of the Contract shall remain in full force and effect." (2015 ICP, Amendment 1, PDF at 238.)

132.   As described above, each of these contracts had the goal of providing more integrated care to enrollees and mandated that Health Alliance and Health Alliance Connect provide all of the services identified in the contract in a manner sufficient to achieve the purpose for which they were furnished.

133.   As described above, all of these contracts further mandated Health Alliance and Health Alliance Connect to implement a SNFist program to provide intensive clinical management of enrollees residing in nursing facilities. And all of these contracts defined SNFists—the licensed professionals providing those services—as a physician or nurse practitioner who works as a part of an organized system of care and whose entire professional focus is the general medical care of individuals residing in a nursing facility and whose activities include enrollee care oversight, communications with families, significant others, PCPs, and nursing facility administration.

---

[38] The original signature page of the 2015 contract available to Relator was not signed.

39

134. As a matter of law, ensuring access to SNFist providers is a material contractual obligation to MMAI contracts. *See* 305 ILCS 5F-20(c) ("A managed care organization may terminate or refuse to renew a contract with a nursing home for a material breach of the contract, including, but not limited to, failure to grant reasonable and timely access to the MCO's care coordinators, SNFists and other providers …").

135. By signing the ICP and MMAI contracts, Health Alliance and later Health Alliance Connect represented that they were able and ready to provide SNFist services to its enrollees in the nursing facility rate cell and that they would do so.

136. But, as the facts below show, Health Alliance and Health Connect failed to provide SNFist services to all its nursing facility enrollees while at the same time accepting the top rate cell payments for them.

**B. Dr. Thomas Prose and His Company, General Medicine of Illinois, P.C., Provide Experienced SNFist Services in Illinois.**

137. Relator Thomas Prose, M.D. is the founder and President of General Medicine, P.C. Besides his M.D., he also has an M.P.H. and M.B.A. all from the University of Michigan. An author, speaker and consultant on SNFist issues, Dr. Prose has more than 30 years' experience in internal medicine, geriatrics, and health care administration and by training and experience is a SNFist, or Post-Hospitalist as is the more common specialty designation today.

138. General Medicine is a provider of SNFist programs, using a collaborative group of board-certified physicians and advanced nurse practitioners whose specialty is providing SNFist services; that is, caring for post-acute care patients in nursing facilities.

These SNFist medical professionals provide care exclusively in that setting. This enables them to focus on the special needs of "patients who are between the hospital and home" rather than divide their attention between other practices, outpatient offices, clinics, and hospitals.

139.   General Medicine's SNFist programs have the goal to improve the care and health of patients in nursing facilities through continuity of care that not only meets the needs of the patients, but also minimizes hospital admissions and readmissions through early interventions. This care further minimizes emergency room visits through 24/7 on-call services. Accordingly, SNFist services reduce overall health care spending in addition to improving the quality of care and health of this group of patients.

140.   General Medicine's services are backed up by decades of experience in the health care industry. Its "dedicated post-hospitalists pride themselves on giving quality care, maintaining manageable caseloads, and decreasing hospital readmission rates and ER visits. With improved quality care comes reduced health care spending."[39]

141.   General Medicine has successfully provided SNFist programs for many MCOs, accountable care organizations, and state health plans in multiple states. It has the expertise, infrastructure, and planning experience to provide effective SNFist programs for nursing facilities. Among other accomplishments, General Medicine's SNFist programs have achieved a hospital readmission rate that is 66% lower than the national average,[40] in

---

[39] https://www.generalmedicine.com/our-performance-results/
[40] https://www.generalmedicine.com/wp-content/uploads/2014/12/Hospital-Readmission-Rates-General-Medicine-Performance.pdf  Note: 67% reduction calculation: 23.8% - 8.2% /23.8% = 66%.

addition to quality metrics in the top 10%.[41] The Illinois Health Care Association has recognized General Medicine as a leading physician care model for post-acute care patients.[42]

142. In the time frame from 2011 through the present, General Medicine has provided SNFist programs for other MCOs in Illinois in addition to Health Alliance and Health Alliance Connect, as discussed below. These include Aetna Better Health, IlliniCare, Molina, Community Care Alliance of Illinois, Meridian, Clearspring Health, and Family Health Network.

C. **General Medicine's Short Tenure with Health Alliance Only Highlighted Defendants' Failure to Provide the Required SNFist Programs.**

143. In its bid to offer an MCO under the MMAI, Health Alliance represented to CMS and HFS that it was prepared to provide SNFist programs for MMAI enrollees. And Health Alliance was well aware it was required to provide SNFist programs for enrollees because that requirement was clearly articulated in both the ICP and MMAI contracts.

144. Health Alliance entered into its ICP contract with HFS in 2013, with an effective rollout date of September 1, 2013.[43] Its three-party MMAI contract was effective November 5, 2013, with a rollout date of March 1, 2014.[44]

145. The MMAI required Health Alliance to provide all required services upon

---

[41] *See, e.g.*, https://www.generalmedicine.com/general-medicine-achieves-top-10-status/
[42] *See* IHCA Regulatory Beat, Aug. 9, 2016, available at http://www.ihca.com/rc_files/149/Regulatory%20Beat%20-%20August%209,%202016.pdf
[43] https://www2.illinois.gov/hfs/MedicalProviders/cc/Pages/RollOutbyHealthPlans.aspx
[44] https://www2.illinois.gov/hfs/MedicalProviders/cc/mmai/Pages/MMAIImplementation Status.aspx

the enrollment of any beneficiary. (MMAI, § 2.3.1.7). The ICP effective start date for an individual enrollee was at most extended to the first day of the second calendar month following the acceptance of the enrollment. (ICP § 4.6.)

146.    Health Alliance therefore should have had a SNFist program in place when its ICP health plan rolled out on September 1, 2013, and when its MMAI health plan was launched on March 1, 2014, but it did not.

147.    In early 2013, when it became known that Health Alliance would be participating in the ICP, General Medicine contacted the MCO about providing a SNFist program. General Medicine periodically contacted Health Alliance about its plans, but very little happened until about June 2014, when Health Alliance and General Medicine began discussions about contracting for a SNFist program. Again, very little occurred until the last few months of 2014. The two parties reached an agreement in December 2014 that General Medicine would provide SNFist programs for both the ICP and MMAI health plans. That agreement has signatures by General Medicine dated December 19, 2014, and by Health Alliance dated January 15, 2015. However, the payment terms were not agreed to until February 17, 2015. And the effective date of the contract was April 15, 2015.

148.    Health Alliance sent a letter dated March 16, 2015, presumably to nursing facilities with enrollees under the ICP and MMAI contracts, entitled "INTRODUCTION OF SNFIST PROGRAM." The letter notes that the plans at issue "*must* have a SNFist program provider overseeing [residents'] care while in your facility" and that Health Alliance had chosen General Medicine "as the SNFist program specialist *for all our members*." (Emphasis added.)

43

149. From the letter, it is evident that Health Alliance had not offered any SNFist program under its ICP and MMAI contracts until April 15, 2015, 18 months after it was required by the ICP contract. In addition, when negotiations were occurring and when preparing for the implementation of a SNFist program effective April 15, 2015, Relator saw nothing indicating that Health Alliance was already operating a SNFist program of any type. There was no handoff of patients, and General Medicine had to develop the program from scratch. In addition, since General Medicine was in the same marketplace as Health Alliance, Relator was aware of who the SNFist providers were, and he was not aware that any of them were providing SNFist programs for Health Alliance prior to General Medicine or, after General Medicine was terminated, for Health Alliance or Health Alliance Connect.

150. The contract memorializing the agreement between Health Alliance and General Medicine was titled "Health Alliance Medical Plans, Inc. Vendor Agreement, Medicare Medicaid Alignment Initiative and Medicaid Plans" (Vendor Agreement). The terms included that Health Alliance contracted with General Medicine as an entity "that provides SNFist/Post Hospitalist Services" for the purpose of providing those services to Health Alliance enrollees. (Vendor Agreement, p. 1.)

151. Attached to the Vendor Agreement is Schedule A-2, titled "SNFIST SERVICES." In that schedule Health Alliance delegates the "SNFist Provider," here General Medicine, "to perform SNFist activities for services as described in section B below." (Vendor Agreement at 15, Schedule A-2, § A.)

152. What follows in Section B is a listing of 16 additional specific responsibilities that Health Alliance requires General Medicine to perform, including for

44

example, completing a health risk assessment for each enrollee within 24 hours of admission to an SNF, developing and updating a treatment plan, visiting onsite on a regular basis, monitoring enrollees for changes in condition and addressing any acute changes, coordinating an enrollee's care with the Health Alliance care manager, and ensuring appropriate planning for transitions (e.g. discharge). (Vendor Agreement at 15-16, § B.)

153.    The SNFist Services Schedule also mandates at § C maintenance of a SNFist program with multiple policies addressing such responsibilities as supervising SNF staff, continual evaluation of enrollees, avoiding transfers to acute facilities, notifying case managers of changes in an enrollee's condition, and documentation of enrollees' care activities. That section further prohibits the SNFist provider from sub-delegating any SNFist activities. (Vendor Agreement at 16, § C.)

154.    Reporting requirements are itemized in § D, including weekly and monthly reports. (Vendor Agreement at 16-17, § D.)

155.    Performance standards are identified in § E, which states that the SNFist provider will be evaluated according to current SNFist requirements "as dictated by state Medicaid and Health Plan requirements," with the promise of corrective action for any deficiencies. (Vendor Agreement at 17, § E.)

156.    For its part, Health Alliance agreed to compensate General Medicine for services provided to enrollees. That compensation had two components: (1) a $100 PMPM payment for "each Health Plan Member residing in a post-acute facility that was a beneficiary of the SNFist program and who was assigned to General Medicine during the preceding month" (Vendor Agreement at 14, Schedule A-1, § 1.1); and (2) a per visit fee

based on the CPT code of the lesser of the provider's customary charges for covered services or 100% of the amounts allowed under Medicare and Illinois Medicaid. (Vendor Agreement, Schedule A-1, §§ 1.2-3.)

157. Prior to agreeing to and signing the vendor contract, General Medicine personnel asked Health Alliance about the number of enrollees they would be serving. This information, among other things, is critical to deciding whether it makes business sense for General Medicine to even enter into a contract to provide services with an MCO, and it is also critical for advance planning that is needed to have the appropriate personnel in place to implement the SNFist program.

158. Health Alliance's response was that General Medicine would be providing a SNFist program to service over 1,000 enrollees.

159. Based on that information and on other factors, General Medicine signed the contract with Health Alliance effective April 15, 2015, and geared up to provide SNFist services for that number of the nursing facility patients enrolled under Health Alliance's ICP and MMAI contracts.

160. The discussions between Health Alliance and General Medicine about the cost and volume of SNFist services demonstrate that Health Alliance knew the cost and importance of SNFist services and that it was unable to provide these services without a provider such as General Medicine.

161. As discussed above, Health Alliance had sent a letter dated March 16, 2015, presumably to all of the nursing facilities with ICP and MMAI enrollees, stating that those

plans must provide a SNFist program for their enrollees and that General Medicine would provide the program for all Health Alliance's members.

162.   Health Alliance generally notified General Medicine about enrollees assigned to it for a SNFist program by providing General Medicine with a list of those enrollees and then updating, adding to, and removing enrollees from the list, sometimes based on information received from General Medicine. Each month, General Medicine then generally invoiced Health Alliance for PMPM payments based on the number of enrollees assigned to it.

163.   By mid-May, Health Alliance had provided General Medicine with a list of only about 28 enrollees. General Medicine notified Health Alliance that it had dedicated resources to Health Alliance's SNFist programs anticipating an exceedingly larger service population and sought resolution of the issue.

164.   Health Alliance increased the number of enrollees on the list provided to General Medicine, but those assignments came far short of providing a SNFist program to all of Health Alliance's nursing facility enrollees. The table below shows the number of enrollees invoiced for PMPM by General Medicine compared to numbers of Health Alliance enrollees in nursing facilities.[45]

| Month | PMPM: # of Enrollees Invoiced to General Medicine | # of Health Alliance Enrollees in Nursing Facilities |
|-------|---------------------------------------------------|------------------------------------------------------|
| May 2015 | 9 | 714 |
| June 2015 | 334 | 665 |
| July 2015 | 331 | 686 |
| August 2015 | 325 | 667 |

[45] These figures are based on data from HFS showing the number of Health Alliance clients in nursing facilities during the identified months.

| Month | PMPM: # of Enrollees Invoiced to General Medicine | # of Health Alliance Enrollees in Nursing Facilities |
|---|---|---|
| September 2015 | 325 | 639 |
| October 2015 | 325 | 598 |
| November 2015 | 325 | 599 |

165. During this time period when Health Alliance was supposed to be providing a SNFist program for all ICP and MMAI enrollees in its nursing facilities, the program was being provided, at best, to only about half of them.

166. Between June and November 2015, General Medicine and Health Alliance had a number of other issues, among them, that Health Alliance was refusing to pay General Medicine in accord with the contract, claiming record-keeping issues.

167. The 2015 ICP contract between HFS and Health Alliance Connect became effective by August 12, 2015, at the latest, but all of General Medicine's dealings were with Health Alliance.

168. In early September 2015, Health Alliance proposed a significantly pared down PMPM amount for General Medicine's SNFist services and demanded a change in the SNFist PMPM case management responsibilities (a key component of a SNFist program). When General Medicine insisted on payment for past work before considering a new agreement, Health Alliance suggested that General Medicine should discontinue seeing enrollees for case management until the new proposed plan was agreed to.

169. General Medicine stood ready to provide a SNFist program to Health Alliance and Health Alliance Connect nursing facility enrollees through the term of its contract, but the last list received from Health Alliance was dated August 31, 2015. General Medicine invoiced Health Alliance through November 2015. General Medicine provided

48

SNFist services to Health Alliance and Health Alliance Connect nursing facility enrollees from May through November—seven months—and from June through November the number of enrollees billed was about 325.

170.    Ultimately, Health Alliance failed to pay General Medicine an invoiced amount due of $83,700, and General Medicine did not agree to the new plan or the reduced PMPM amounts.

171.    On November 11, 2015, Health Alliance notified General Medicine by letter of its intent to terminate the Vendor Agreement with General Medicine effective February 9, 2016.

172.    Health Alliance did not renew its MMAI contract and withdrew from the demonstration effective December 31, 2015.

173.    Health Alliance and/or Health Alliance Connect continued to offer its MCO under the ICP contract until December 31, 2016. After that, Health Alliance no longer participated in Illinois Medicaid-only MCOs.

### D. Defendants Violated the FCA and IFCA by Failing to Provide SNFist Services but Collecting Capitation Rates as If They Had.

174.    During the time periods below, Health Alliance and/or Health Alliance Connect offered managed care services under three contracts requiring SNFist programs:

| ICP Health Plan 2013 and 2015 Contracts | September 9, 2013, through December 31, 2016 (39 months, 23 days) |
|---|---|
| MMAI Health Plan 2015 Contract | March 1, 2014, through December 31, 2015 (22 months) |

175.   In none of those months did Health Alliance provide a SNFist program for all nursing facility enrollees. For 32 months, Health Alliance provided no SNFist program at all. For the very limited 7 months that Health Alliance actually assigned enrollees to General Medicine, generally half or more of its nursing facility enrollees were not included and received no SNFist services.

176.   On information and belief, throughout the above time periods, extending over close to 40 months, Health Alliance and/or Health Connect collected the highest Nursing Facility rate cell amount for every ICP and MMAI health plan enrollee residing in a nursing facility on the first day of the month.

177.   On information and belief, Health Alliance did not inform the Government that it was failing to provide the required SNFist Program. Absent a report or disclosure from Health Alliance, the Government would have no way of knowing that it was not getting the services for which it was paying the high nursing facility rate.

178.   As stated above, Relator was aware of the market and the providers of SNFist services. He was not aware of any provider other than General Medicine that provided a SNFist program to Health Alliance or Health Alliance Connect. Nor was he aware through his knowledge of the market or any public source that Health Alliance received any deficiency notices related to SNFist services or that any sanctions, corrective action plans, or penalties were imposed on Health Alliance or Health Alliance Connect for these failures.

179. The table below[46] generally shows the monetary impact of Defendants' conduct. Using the exemplar capitation rate data discussed above, and a conservative presumption that Health Alliance/Health Connect had 600 nursing facility enrollees and the differential between the Other Waiver and nursing facility rate is $1,800, Health Alliance collected approximately $1,080,000 per month to provide the required services for the nursing facility enrollees. Since, as stated above, the primary difference between the other waiver and nursing facility rate cells is the required SNFist program for the nursing facility enrollees, Health Alliance received a massive premium for a required program that it failed to provide for almost 40 months.

| Contract | Nursing Facility Rate | Amount above Other Waiver Rate | Amount above Community Rate |
|---|---|---|---|
| ICP | $5,563.23 | $2,080.52 | $4,682.85 |
| MMAI | $4,006.41 (21-64) | $1,416.83 | $2,879.97 |
| MMAI | $3,897.45 (65+) | $1,850.68 | $2,843.07 |

The very small amount paid to General Medicine for its few months of services pales in relation to the tens of millions of dollars Health Alliance collected. A significant portion of that amount should have been spent providing a SNFist program for its enrollees.

180. In addition, the absence of a SNFist program deprived nursing facilities of the benefits of such a program, leading to a continuation of avoidable hospitalizations, re-

---

[46] For the ICP rates, these amounts are based on are sample available capitation rates for particular periods during 2013 (non-risk adjusted); for the MMAI rates, these amounts are based on the available capitation rates for Ford County, Illinois in 2015 (non-risk adjusted).

admissions and emergency department visits that added to rather than reduced unnecessary costs to the ICP and MMAI programs.

181.    Under both its ICP and MMAI contracts, Health Alliance and/or Health Alliance Connect remained at all times responsible for meeting its contract requirements regardless of whether any subcontractor was involved, and here, that was a very short time period. (2013 ICP, § 5.27.2; 2015 ICP, § 5.28.2; MMAI § 2.7.2.2.1.)[47]

182.    Health Alliance knew it was obligated to provide a SNFist program for all nursing facility enrollees. Its "offer" in response to the RFP for the ICP recited its claimed plan to provide a SNFist program 24/7 "with a caseload ratio of 50 members to 1 Advanced Practice Professional." The ICP and MMAI contracts that Health Alliance signed further left no doubt that Health Alliance was obligated to provide a SNFist program for all nursing facility enrollees.

183.    As a sophisticated veteran of the medical services industry for over 30 years, Health Alliance understood how capitation rates were derived and that they are designed and actuarially calculated to provide reimbursement to the contractor for services rendered. Health Alliance also understood that it had entered into a risk contract intended to cover the costs of all services required, including the SNFist program. Thus, Health Alliance had a strong incentive to ensure that the capitation rate was high enough to cover its costs plus a reasonable profit, because it would not profit, and might even lose money, if the rate were

_____

[47] The MMAI contract further required the Contractor, if its providers were unable to provide necessary services, to go outside of network to cover those services. (MMAI, § 2.9.1.7.)

too low. Finally, by the very difference among capitated rate cells, Health Alliance knew that the Government viewed the services required for nursing facility enrollees as critical, thereby justifying a capitation rate multiple thousands of dollars higher than the community rate.

184.    Despite this knowledge, Health Alliance and Health Alliance Connect failed to provide a SNFist program for all nursing facility enrollees, and nonetheless accepted all of the nursing facility enrollees assigned to it from HFS. Health Alliance and Health Alliance Connect sent the enrollees welcome letters, entered them into their data systems, and claimed, received, and retained the capitated rate CMS and HFS paid for those enrollees, knowing that it was failing to provide the services for which that capitated rate was paid.

185.    This conduct—overcharging the Government—constitutes the factually false type of claim that the Seventh Circuit has characterized in a similar case[48] as an "archetypical" or "canonical" claim under the FCA and IFCA; that is, the defendant directly sought, received, and retained reimbursement for SNFist services it did not provide. *See Molina*, 17 F.4th at 740-41.

186.    Health Alliance also fraudulently induced CMS and HFS to enter into ICP and MMAI contracts by agreeing to provide SNFist services and a SNFist program for its ICP and MMAI enrollees. Based on the questions asked in the RFP for the ICP, the explicit requirements for SNFist programs in both the ICP and MMAI contracts, and the significant

_____

[48] The *Molina* case was brought by the Relator here, Thomas Prose, M.D., under highly similar facts.

difference in capitation rates for enrollees residing in nursing facilities compared to the capitation rates for other waiver and community enrollees, Health Alliance and Health Alliance Connect knew that CMS and HFS would not have entered into the ICP and MMAI contracts absent a promise to provide a SNFist program.

187.   By its RFP representations and by entering into the contracts, Health Alliance made such a promise, but its conduct showed the promise was false when made. Health Alliance had not engaged any subcontractor to provide those services at the time it made its offer and entered into the contracts in 2013. Health Alliance further demonstrated no intent to provide a SNFist program for all nursing facility enrollees by delaying engagement of a SNFist provider until April 2015, by failing to assign all eligible nursing facility enrollees to General Medicine, failing to pay General Medicine for the SNFist services provided, and failing to replace General Medicine with another SNFist provider.

188.   In addition, Health Alliance repeated its false promise/inducement when it agreed to and signed each of the five amendments to the 2013 ICP contract, which stated that "All other terms and conditions of the Contract shall remain in full force and effect."

189.   During the time period that General Medicine was on contract (i.e., from April 15, 2015 to February 9, 2016) Health Alliance and/or Health Alliance Connect signed a new contract with HFS at least by August 12, 2015. But Health Alliance and/or Health Alliance Connect knew at the time it signed the contract that they were not providing SNFist services to all enrollees and, by refusing to assign all nursing facility enrollees to General Medicine, showed their intent never to provide SNFist services to all enrollees as

required by applicable contracts, thereby engaging in additional conduct constituting fraudulent inducement.

190.    Health Alliance and Health Connect also knowingly violated the FCA by making or causing to be made false or fraudulent claims and statements material to a false or fraudulent claim that Health Alliance and Health Alliance Connect were entitled to the highest capitation rate because they were providing a SNFist program for all nursing facility enrollees.

191.    As discussed above, Health Alliance failed to disclose to the Government from the very beginning that it was not prepared and did not intend to meet the SNFist requirements, thereby making all "readiness" statements false. The ICP and MMAI contracts required Health Alliance to report in various ways (e.g., encounter data, compliance, and quality control functions) its compliance with the requirements of the ICP and MMAI contracts. To the extent that Health Alliance and/or Health Alliance Connect provided any encounter data directly or impliedly claimed that a SNFist program was provided to nursing facility enrollees, those statements were false except for the very small subset of enrollees that General Medicine was allowed to serve. By asserting that it was in compliance with the contracts and failing to tell the truth about its failure to provide a SNFist program to its enrollees, Health Alliance knowingly, impliedly, and falsely certified that it was providing services for which it was entitled to payment when, in fact, it was not providing those services. Health Alliance also covered up its fraudulent conduct by failing to report its termination of General Medicine to HFS.

192.    In addition, Health Alliance signed five amended 2013 ICP contracts (on December 12, 2013, February 27, 2014, September 18, 2014, May 7, 2015, and June 29, 2015) and four amended 2015 ICP contracts stating that it would comply with all of the other terms and conditions of the contract that remained "in full force and effect." In so doing, Health Alliance knowingly, impliedly, and falsely certified that it was providing the promised SNFist program to all eligible nursing facility enrollees.

193.    Health Alliance further violated the conversion provision of the FCA and IFCA. The Government provided Health Alliance and Health Alliance Connect with a monthly capitated payment for each nursing facility enrollee that included an actuarially determined amount for the SNFist program that Health Alliance and Health Alliance Connect were obligated to provide to the Government's beneficiaries. Health Alliance converted that amount for its own benefit instead of the use for which CMS and HFS provided the payment.

194.    Finally, Health Alliance also violated the reverse false claims provisions of the FCA and IFCA by failing to return determinable amounts to the Government that it should not have received because it failed to provide the SNFist program required to receive the highest capitation rate for its enrollees in nursing facilities.

195.    Even without discovery, many facts demonstrate that Health Alliance's false or fraudulent claims or statements were material to the Government's decision to enter into the ICP and MMAI contracts with Health Alliance and would influence the Government's decision whether to pay the nursing facility capitation rate under circumstances where

Health Alliance failed to provide a SNFist program for all nursing facility enrollees. These facts include:

- Compliance with the certification and program requirements of the contracts was an express condition of payment.

- An express condition of allowing Health Alliance to enroll any beneficiaries at all was a successful completion of its Readiness Reviews for the two contracts; on information and belief, those Readiness Reviews would at least generally reference the contracts, if not specifically identify the SNFist program.

- The differential in the capitation rate cell amounts between nursing facility enrollees, other waiver, and community enrollees is sufficiently large to offer "strong support for a finding of materiality." *Molina*, 17 F.4th at 743; *see also Ruckh v. Salus Rehab., LLC,* 963 F.3d 1089, 1105 (11th Cir. 2020) (causing Government to pay higher amounts than it would pay otherwise goes "to the essence of the parties' economic relationship").

- Both the ICP and MMAI contracts had as a primary goal better coordination of care to achieve better health for enrollees and to accomplish efficiencies and cost savings. The MOU for the MMAI stated that the demonstration was intended to address Illinois' "high rate of potentially avoidable hospital admissions" and high proportion of institutional services utilized rather than home and community-based services. More specifically, the MOU identified, as goals for the demonstration, to "reduce avoidable hospital admissions, improve quality of care and reduce health disparities, meet both health and functional needs of Enrollees, and improve transitions between care settings."

- The goals of SNFist programs support the primary goals of the ICP and MMAI contracts; that is, to coordinate treatment to achieve better health outcomes for nursing facility enrollees; facilitate transition to community living; and reduce hospitalizations, re-admissions, and emergency department visits.

- The false or fraudulent claims or statements were neither minor nor insubstantial. The congruence of the goals of the ICP, MMAI, and SNFist program demonstrates that providing a SNFist program went to the heart of the bargain; that is, was critical to the achievement of the goals of the two programs.

57

- Both the ICP and MMAI contracts singled out a SNFist program as a mandated and explicitly required medical service.

- Both the ICP and MMAI contracts evaluated the efficacy of their programs in achieving their goals. To the extent that Health Alliance purported to offer SNFist services, but did not, any data based on Health Alliance enrollees skewed the evaluation results. This prevented the Government from achieving an accurate assessment of the impact of SNFist programs, thereby denying the Government the benefit of its significant investment in SNFist services.

196.    Based on all of the above facts, Relator seeks treble damages and civil penalties on behalf of the Government for Defendants' flagrant failure to deliver what the Government paid for, to the detriment of a vulnerable and needy nursing facility population, and in violation of the FCA and IFCA.

## VIII.    CLAIMS FOR RELIEF

### COUNT I
### FCA: Presentment of False Claims
### (31 U.S.C. § 3729(a)(1)(A))
### Against Health Alliance Medical Plans, Inc., and Health Alliance Connect, Inc.

197.    Relator realleges and incorporates by reference paragraphs 1 through 196.

198.    Through the acts described above and otherwise, Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

199.    The United States was unaware of the false or fraudulent nature of the claims Defendants submitted or caused to be submitted.

200.    The false or fraudulent claims Defendants knowingly submitted, or caused to be submitted, to the United States were material to whether the claims for payment were within the United States' legal authority to pay those claims.

201.    Payment of the ineligible claims was a reasonable and foreseeable consequence of Defendants' conduct.

202.    Had the United States actually known of the false or fraudulent nature of Defendants' representations and claims, it would have been prohibited by law from making corresponding payments to Defendants.

203.    By reason of Defendants' violations of the FCA, the United States has suffered and may continue to suffer economic loss.

**COUNT II**
**FCA: Using False Statements Material to False Claims Paid**
**(31 U.S.C. § 3729(a)(1)(B))**
**Against Health Alliance Medical Plans, Inc., and Health Alliance Connect, Inc.**

204.    Relator realleges and incorporates by reference paragraphs 1 through 196.

205.    Through the acts described above and otherwise, Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

206.    The United States was unaware of the falsity of the records or statements that Defendants made or caused to be made.

207.    The false records or statements Defendants knowingly made were material

to whether the claims for payment were within the United States' legal authority to pay those claims.

208.    Payment of the ineligible claims was a reasonable and foreseeable consequence of Defendants' conduct.

209.    Had the United States actually known of Defendants' materially false records or statements, it would have been prohibited by law from paying the affected claims.

210.    By reason of Defendants' violations of the FCA, the United States has suffered and may continue to suffer economic loss.

**COUNT III**
**FCA: Conversion**
**(31 U.S.C. § 3729(a)(1)(D)**
**Against Health Alliance Medical Plans, Inc., and Health Alliance Connect, Inc.**

211.    Relator realleges and incorporates by reference paragraphs 1 through 196.

212.    Through the acts described above and otherwise, Defendants knowingly kept possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivered, or caused to be delivered, less than all of that money or property, in violation of 31 U.S.C. § 3729(a)(1)(D).

213.    The United States, unaware of Defendants' possession, custody, or control of property or money used, or to be used, by the Government and unaware of Defendants' knowing delivery of, or causing to be delivered less than all of that money or property, has been deprived of money or property that it otherwise would have received.

214.    By reason of Defendant's violations of the FCA, the United States has suffered and may continue to suffer economic loss.

**COUNT IV**
**FCA: Obligation to Pay Money to the Government**
**(31 U.S.C. § 3729(a)(1)(G))**
**Against Health Alliance Medical Plans, Inc., and Health Alliance Connect, Inc.**

215.   Relator realleges and incorporates by reference paragraphs 1 through 196.

216.   Through the acts described above and otherwise, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

217.   The United States was unaware of the falsity of the records or statements Defendants made or caused to be made and was unaware of Defendants' conduct that concealed or improperly avoided Defendants' obligation to repay the federal government.

218.   The false records or statements Defendants knowingly made or caused to be made were material to Defendants' obligation to pay monies to the United States.

219.   By reason of Defendants' violations of the FCA, the United States has suffered and may continue to suffer economic loss.

**COUNT V**
**Illinois FCA: Presentment of False Claims**
**(740 ILCS 175/3 (a)(1)(A))**
**Against Health Alliance Medical Plans, Inc., and Health Alliance Connect, Inc.**

220.   Relator realleges and incorporates by reference paragraphs 1 through 196.

221.   Through the acts described above and otherwise, Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be

presented to the State of Illinois false or fraudulent claims for payment or approval in violation of 740 ILCS 175/§ 15C.02(a)(1)(A).

222.    The State of Illinois was unaware of the false or fraudulent nature of the claims Defendants submitted or caused to be submitted.

223.    The false or fraudulent claims Defendants knowingly submitted, or caused to be submitted, to the State of Illinois were material to whether the claims for payment were within the State of Illinois's legal authority to pay those claims.

224.    Payment of the ineligible claims was a reasonable and foreseeable consequence of Defendants' conduct.

225.    Had the State of Illinois actually known of the false or fraudulent nature of Defendants' representations and claims, it would have been prohibited by law from making corresponding payments to Defendants.

226.    By reason of Defendants' violations of the IFCA, the State of Illinois has suffered and may continue to suffer economic loss.

**COUNT VI**
**Illinois FCA: Using False Statements Material to False Claims Paid**
**(740 ILCS 175/3(a)(1)(B))**
**Against Health Alliance Medical Plans, Inc. and Health Alliance Connect, Inc.**

227.    Relator realleges and incorporates by reference paragraphs 1 through 196.

228.    Through the acts described above and otherwise, Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be

made or used false records or statements material to the payment of false or fraudulent claims, in violation of 740 ILCS 175/3(a)(1)(B).

229. The State of Illinois was unaware of the falsity of the records or statements that Defendants made or caused to be made.

230. The false records or statements Defendants knowingly made were material to whether the claims for payment were within the State of Illinois's legal authority to pay those claims.

231. Payment of the ineligible claims was a reasonable and foreseeable consequence of Defendants' conduct.

232. Had the State of Illinois actually known of Defendants' materially false records or statements, it would have been prohibited by law from paying the affected claims.

233. By reason of Defendants' violations of the IFCA, the State of Illinois has suffered and may continue to suffer economic loss.

**COUNT VII**
**Illinois FCA: Conversion**
**(740 ILCS 175/3(a)(1)(D))**
**Against Health Alliance Medical Plans, Inc., and Health Alliance Connect, Inc.**

234. Relator realleges and incorporates by reference paragraphs 1 through 196.

235. Through the acts described above and otherwise, Defendants knowingly kept possession, custody, or control of property or money used, or to be used, by the State of Illinois and knowingly delivered, or caused to be delivered, less than all of that money or property, in violation of 740 ILCS 1753(a)(1)(D).

236.   The State of Illinois, unaware of Defendants' possession, custody, or control of property or money used, or to be used, by the State of Illinois and unaware of Defendants' knowing delivery of, or causing to be delivered less than all of that money or property, has been deprived of money or property that it otherwise would have received.

237.   By reason of Defendants' violations of the FCA, the State of Illinois has suffered and may continue to suffer economic loss.

**COUNT VIII**
**Illinois FCA: Obligation to Pay Money to the Government**
**(740 ILCS 175/3(a)(1)(G))**
**Against Health Alliance Medical Plans, Inc., and Health Alliance Connect, Inc.**

238.   Relator realleges and incorporates by reference paragraphs 1 through 196.

239.   Through the acts described above and otherwise, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State of Illinois, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State of Illinois, in violation of 740 ILCS 175/3(a)(1)(G).

240.   The State of Illinois was unaware of the falsity of the records or statements Defendants made or caused to be made and was unaware of Defendants' conduct that concealed or improperly avoided Defendants' obligation to repay the State of Illinois.

241.   The false records or statements Defendants knowingly made or caused to be made were material to Defendants' obligation to pay monies to the State of Illinois.

242.   By reason of Defendants' violations of the IFCA, the State of Illinois has suffered and may continue to suffer economic loss.

**PRAYER FOR RELIEF**

**WHEREFORE**, Relator Thomas Prose, M.D, on his own behalf and on behalf of the United States of America and the State of Illinois, respectfully requests that this Court:

      A.      Enter judgment for the United States, the State of Illinois, and Relator and against Defendants jointly and severally for their violations of the FCA and the IFCA.

      B.      Order Defendants to cease and desist from violating the FCA and the IFCA.

      C.      Award the United States and the State of Illinois three times the amount of the actual damages sustained by them as a result of Defendants' violations of the FCA and the IFCA as alleged in this Complaint;

      D.      Assess civil penalties against Defendants as required by law for the false statements and false claims alleged in this Complaint and for Defendants' failure to meet their obligation to pay money to the federal and state governments;

      E.      Award Relator the maximum relator's share allowed, in an amount to be agreed upon by the Government and Relator or, if no agreement can be reached, by the Court, pursuant to 31 U.S.C. § 3730(d) and the equivalent statutory provisions in 740 ILCS 175/§ 15C.13;

      F.      Award prejudgment interest;

      G.      Award Relator statutory attorney's fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d) and 740 ILCS 175/4(d).

**RELATOR DEMANDS TRIAL BY JURY ON ALL COUNTS WHERE JURY IS AVAILABLE.**

Respectfully submitted,

Dated: December ⸹, 2021

Neil M. Rosenbaum, IL No. 6283878
nrosenbaum@fvldlaw.com
Damon E. Dunn, IL No. 06180629
ddunn@fvldlaw.com
Bryan G. Schatz, IL No. 6327557
bschatz@fvldlaw.com
Gabrielle A. Long, IL No. 6337726
glong@fvldlaw.com
FUNKHOUSER VEGOSEN LIEBMAN
  & DUNN LTD.
55 West Monroe Street, Suite 2300
Chicago, Illinois 60603
Telephone: (312)701-6800

Susan M. Coler, IL No. 6201012
HALUNEN LAW
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone:  (612) 605-4098
coler@halunenlaw.com

Lon R. Leavitt, AZ No. 35825
HALUNEN LAW
One Renaissance Tower
Two North Central Avenue, Suite 1800
Phoenix, Arizona 85004
Telephone: (602) 254-6494
leavitt@halunenlaw.com

*ATTORNEYS FOR RELATOR*

# Exhibit A

80 South Eighth Street
Minneapolis, MN 55402
Telephone (612) 605-4098
coler@halunenlaw.com
Lon R. Leavitt, AZ No. 35825
HALUNEN LAW
One Renaissance Tower
Two North Central Avenue, Suite 1800
Phoenix, Arizona 85004
Telephone: (602) 254-6494
leavitt@halunenlaw.com

*ATTORNEYS FOR RELATOR*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF ILLINOIS *ex rel.* THOMAS PROSE, M.D.,<br><br>         Relator,<br><br>    v.<br><br>HEALTH ALLIANCE MEDICAL PLANS, INC., an Illinois stock insurance company, and HEALTH ALLIANCE CONNECT, INC.,<br><br>        Defendants. | CIVIL ACTION NO. _____<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMAND**<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**DO NOT PLACE ON PACER DO NOT PLACE IN PRESS BOX** |

ii

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| SEALED<br><br>        Relator,<br><br>   v.<br><br>SEALED<br><br>        Defendants. | CIVIL ACTION NO. _____<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMAND**<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**DO NOT PLACE ON PACER**<br>**DO NOT PLACE IN PRESS BOX** |

i